Good morning. Our first case today is number 25-2014, John Doe v. The Trustees of Princeton University. Mr. Muha. Good morning and may it please the Court. I'm Chris Muha from Dillon PLC on behalf of John Doe. I have reserved three minutes, please, for rebuttal time.  Great, thank you. Your Honors, the District Court here made the exact same errors that the District Court made in Princeton III. The District Court, as to the breach of contract claim and Title IX claim, both failed to apply the Princeton III framework and drew improper inferences in Princeton's favor at the motion to dismiss stage. As to the breach of contract claim, it dismissed the claim after drawing the inference in Princeton's favor that the panel, quote, made credibility determinations based on the evidence before it. That is what the complaint alleges in great detail did not happen in this case. It alleges that the panel repeatedly disregarded exculpatory evidence and made unsupported credibility findings, which Princeton III said suffices to state this kind of a claim when there's a lower evidentiary standard at issue here, not the clear and persuasive evidence standard that gives John Doe, in this case, even more protection than the plaintiff in Princeton III. But beyond that, there also is not just those collateral ways of demonstrating that the standard wasn't applied. John Doe is actually able to demonstrate from the terms of the decision itself that the cherry-picked evidence that the panel relied on doesn't actually support its finding. It rested its decision on two things by its own terms, the conclusion that the complainants were, quote, consistent in the stories they told and the fact that they were supposed admissions in text message evidence. And the complaint alleges in great detail that neither of those is true. Jane Roll told no fewer than three different stories about what supposedly happened to her that night. She said first she didn't remember what happened, but only knew what had happened because Sarah Smith told her. The fact that in her own text messages months before the hearing, before she brought her allegations, she knew wasn't true. There are issues as well with Doe. There is a text message. There is the voice recording. And with student four, given the testimony and notes of the investigator. So in the normal course, we defer to the fact finder as to credibility determinations. Why shouldn't we give the committee that latitude here? So to take your first part, the voice recording and the text messages. So the voice recording is not relied upon by the panel at all. They chose not to rely on it. And for good reason, because the recording does not match what Jane Rose says supposedly happened. And she did not get the recording and say, wait, that's not what happened. Go and do it again. So the panel by its own admission did not rely on that. And as to the text messages, it didn't actually identify a text where it said there was a supposed admission. Princeton, in its briefing, has tried to pick out one, the one that it thinks would maybe most fit the bill. But that text manifestly is not an admission because after John sent that text to her two weeks later, Jane is telling friends privately, not in front of John, that he doesn't actually think he did anything to her. He doesn't remember touching her. He doesn't believe that he actually choked her or harmed her in any way. So Jane Rose herself proves that that text is not an admission. And neither in the decision or in this litigation has Princeton identified any other text that is supposedly an admission. To your point about deference, the court is tasked with finding whether there is substantial compliance. But substantial compliance doesn't mean complete deference. If that were true, then Princeton 3 would have had to have come out the other way. And here there is nothing close to substantial compliance as to the application of the clear and persuasive evidence standard. Because again, not only do we have the same kinds of allegations that suffice in Princeton 3, we have a direct demonstration that the decision itself is not supported by the evidence it purports to rely on. We have that and use sciences as selective enforcement cases. That doesn't describe this case. Why should we simply imprint Princeton 3 onto this case? So as to the breach of contract or the Title IX, Your Honor? Title IX. Title IX, yes. So there is no selective enforcement allegation. That is correct. That is the byproduct of an archaic artificial framework that had originally come from the Second Circuit that had imposed one of two ways of proving a Title IX claim. Purdue University expressly did away with that, and that is the standard that use sciences adopted. So it's just a historical artifact that the two published decisions in the circuit both involved selective enforcement claims. They were both filed, Princeton 3 I think was filed a month before use sciences was published. So it put its allegations into those two old buckets, and there happened to be selective enforcement evidence. So Princeton 3 relied on that in finding that the Title IX claim had been stated. But multiple courts of appeals have all, both applying Purdue and applying the old framework that existed before Purdue, have all found Title IX violations without any kind of selective enforcement allegations. And the way they analyzed those claims is what the court in Princeton 3 said has to be done here, which is to look at the total mix of information suggesting bias. And that involves two things. That involves acts that are facially neutral as to gender. Maybe they were motivated by gender bias, maybe not. And then acts or pieces of evidence that are more explicitly gendered on their face. And so, for instance, in the Oberlin decision out of the Sixth Circuit, the court said the primary evidence of bias there was the fact that the decision there was just as here was completely unsupported by the evidence. And then also noted that there was more gender-specific evidence on the periphery, which together allowed the inference that gender bias affected the outcome, at least in part. So, too, in the Eighth Circuit, in the Arkansas decision, which we talk about in our brief, there the primary evidence of gender bias was the fact that the decision went against the substantial weight of the evidence. And the court looked at that in conjunction with the pressure on the university, as was also the case here, and concluded that together that that stated a claim. This is the standard that applies, as far as I'm aware, in every anti-discrimination context that is out there. Let me ask you a technical question. When you're making the argument that their decision is against the weight of the evidence, should we consider that a procedural regularity, or is that an independent basis for considering their decision to not meet the RRR standard? Right. I think the terminology probably isn't too important. So, for instance, the Second Circuit, in the Menacher decision, referred to this kind of thing as a procedural irregularity. When there's a decision that goes against the great weight of the evidence, or a party is credited despite significant evidence to the contrary, it called that a procedural irregularity. And I'd like in the village of Arlington Heights, you know, when it's talking about the Equal Protection Clause, they talk about both procedural irregularities and substantive departures from the evidence, which I think probably sounds a little more like what you're talking about. So, I'm not sure that the label matters. I think what's important, at least for the Title IX analysis, is simply, is there some sort of irregularity, something that doesn't make sense? And then is there any evidence to suggest, like if it's not explicitly gendered itself, is there any evidence to make it plausible that gender influenced that action, even if other things are also plausible, and perhaps even more plausible than gender bias? So, you've pointed us to a number of circuits that have taken the view that if it's plausible either way, that you would go with the inference in your client's favor. But the 11th Circuit in Stanford has taken a different view. Why shouldn't we think about it if it's equally plausible? At that point, why isn't it simply speculation that we're talking about gender bias as opposed to anti-respondent bias? Well, so first, anti-respondent bias doesn't get any sort of primacy of place or primacy of inference here. At this circuit in Princeton III, I think has already answered that question and said the fact that pro-complainant or anti-respondent bias might be plausible doesn't mean that gender bias is not also plausible. And if you have two things that are equally plausible, they can both be independently plausible for different reasons without either, without meaning, I think what you're saying is if there's just pure speculation and nothing to suggest one way or the other that gender is involved or that pro-complainant bias is involved, that has someone's data to claim. But that's not the case here. Here there is explicit evidence of gender bias in the pressure that was happening at the school at the time, in the fact that- That's sort of on a global scale. There's no real direct evidence of it with respect to your client, though, right? We don't really have comparatives here. We've got the noise. We've got the dear colleague letter, the rescinding of the dear colleague letter, the 2019 protests, et cetera. But that's sort of all environmental. It's not really directly related to your client, right? It's not directly. It doesn't, there was no one talking specifically about this proceeding. But in the Bong case, that was the same, that the external pressure was not- There's no other comparator. There's not a case, for example, where there was a male complainant and the hearing was conducted in the same sort of way this one was, where the male complainant was interviewed three times and the defendant was interviewed once, et cetera, et cetera. There's just no comparator out there, right? There certainly won't be anything that's exactly like this, Your Honor. That's correct. And any time that there is a totality of the evidence- Is there anything remotely like this? There are certainly cases where the imbalanced investigation or questioning of witnesses has been a significant part of the evidence that a court has found as part of the gender bias mix. So the vengulatory decision, which we have discussed, this was, I believe, part of the finding in the University of Arkansas and in the Schweik decision out of the Ninth Circuit. Sort of the imbalanced nature of the proceeding was part of what the court relied on. But in all of those cases, the courts are, again, looking at the totality of the evidence. Let me ask a follow-up about the unbalanced nature. You cite the fact that several times, I think, that the investigators interviewed the complainants multiple times, but your client only once, correct? Correct. Your client had a right to be interviewed more if he had asked. He didn't sort of request more conversation with the investigators, did he? To my knowledge, he didn't, but I don't believe that that is- That is, first of all, I think would have to be an inference drawn in the favor of Princeton that that was done in order to sort of- As a protection for Doe or that there's some non-discriminatory reason for that. But no, he was never told he was allowed to request an interview. I suppose he could have, but he's a college freshman who's not allowed to have a lawyer professional advise him at the hearing here. So I think it's fair to say that that's not a reasonable inference to draw or something that's reasonable to put on him. And also, there's no suggestion that the complainants themselves asked to be re-interviewed. This was Princeton, by all accounts, going to them and asking them about some of the evidence Sean had submitted. And the evidence that this was unbiased- that was biased, rather, and done in their favor is from paragraphs 141 to 44 of our complaint, where we talk about how the investigator, despite conducting these follow-up interviews, never actually confronted Sarah or Jane with the changes in their testimony. So it wasn't as though they were going back and saying, you know, look, like you said, you know, Jane, first you said you didn't remember. That seems to be the crux of your differential treatment claim is that everything he said is being challenged and nothing they said is being challenged, to put it sort of bluntly. That is absolutely part of it, Your Honor, yes, and also the way that they were then questioned at the hearing as well. So John was grilled for an hour and a half. Sarah was- And do we know why Jane didn't participate? We didn't. We just know that a few days before- the hearing date moved a few times, but sometime at the end of October, I believe, she said- she indicated that she wasn't going to participate. Which makes all the more glaring the fact that the investigator, in none of the three interviews, actually confronted her and said, like, first you said he lifted you up by the neck for five to six seconds, where you're straining on your- literally straining on your tiptoes, if that's even, like, physically possible to do with one arm. And then saying later, oh, no, he was just pushing against the front and doing it in kind of like a flirty way. Like, nobody actually said, like, how does that make sense? How do you get from one to the other? And then she doesn't show up at the hearing, and she is still found by the panel to have testified consistently. So going back to gender bias and building on one of the questions from my colleague about whether this is about gender or an anti-respondent or pro-respondent bias, how do you envision, or what's the claim, how the process for your client in particular would have been different if his gender was different and he was female instead of male? So I think the inference is that he wouldn't have- he would have been treated more fairly. What does that mean? Well, here the unfairness was that he was not given chances before the- during the proceeding to explain himself. At the hearing, he was grilled much more intensely, and he was ultimately found not to be credible, even though his story had been entirely consistent. But what's the evidence that that treatment derived from the fact of his gender? So the evidence comes from two areas, Your Honor. One is the pressure on the university, and to sort of get back to your point, Your Honor, there is some evidence in the record that that- the sort of the toxic masculinity theme that was sort of percolating on the campus for a few years did affect at least one of the hearing panel members. And this is from paragraphs 177 and 78, because John was asked multiple questions about whether he was the controlling friend in their relationship. And in asking the question, the panelists said- asked some sort of comments on the view that you are, quote, taking yourself to have a say in how these other women in your life behave in an intrusive and controlling manner. I just wanted you to agree to say something to the perspective that someone might react by saying this is intrusive and controlling. You think you have an entitlement to tell these women how they should behave. So I think there is evidence in this proceeding that this toxic masculinity idea was affecting at least one panelist's view of the evidence. But the other evidence of gender bias here, Judge Mascot, is what was the core evidence in the Baum case, which is that the parties, the female parties and witnesses, to the extent there were credibility determinations made, they were uniformly in favor of the women and against the men. And so here are the two complainants. I think the only- there are four people that you could say were either explicitly or implicitly had a credibility finding made in this decision. The two women obviously were found credible. John in student four, the male and the only eyewitness, were both found not credible. That sort of uniform gendered crediting of testimony was the primary evidence of gender bias in the Baum decision, along with the external evidence sort of that was- of what was in the atmosphere at the university at the time. And so we have both of those here. And then on top of that, Your Honor, we have, again, the extreme procedural irregularity of a decision that literally has no support in the evidence that the panel relied upon, which, again, the Oberlin court found was the strongest evidence of sex bias there. And I think the way the court should approach this is the way that the Second Circuit has articulated it in Menneker, which is that the greater the procedural irregularities, the less sort of like explicit evidence of gender bias one might need in order to conclude that as a whole, that is likely or at least plausible that that might be what's affecting and creating all of these- all the bias and all the problems in the proceeding. In responding to Judge Mascot's question, you're pointing us to lots of evidence and cases that dealt with sexual assault, as did the dear colleague letter and those procedures that it put in place. We're dealing here with assault, but it's just a personal safety policy. Why should we take all of the same framework and those inferences from the sexual assault context and put it into a personal safety policy context? Yes. Your Honor, the pressure is the same, regardless of what process Princeton chooses to put it through. And here, the allegations are that- allegations of violence by a man against a woman in the context of romantic activity. The allegation was that they kissed before- they kissed initially, and then John supposedly reacted to Jane kissing Sarah, so he's upset at another act of sexual activity. And then, by Sarah's admission and the testimony of, I believe it's student six, Jane and John then kissed again in the common room, supposedly like an hour or two after he had supposedly choked her for five to six seconds. They kissed again. And Jane doesn't even deny that. She just says, I don't remember, I don't recall if that happened. So is your answer that that framework and inferences apply because we look to the underlying facts here and we characterize this as a sexual assault case? Or is it that we can categorically take the- that framework and inferences and apply it in the case of assault, a personal safety policy? I think as to any allegation under the personal safety policy, I would say no. If it were just two people getting a fight over a sports game, then I would say no, that's- there's no reason there. But the allegations here, the kind of activity is exactly the kind of activity that usually is resolved under Title IX. And quite frankly, I think the way that the RRR defined dating violence at the time, I think this plausibly could have been put through the Title IX process. Because dating violence was defined as, quote, violence committed by an individual who is or has been in a social relationship of a romantic or intimate nature with the victim. So I think the fact that Princeton chose to put it through the process where there is less procedural protection for the respondent probably is in itself telling. And is part of the reason that it was put through this process. So, yes, I think the pressure, at least in this case, it is at least plausible to infer that that pressure touched this case. And again, I think there is direct evidence of that in paragraphs 177 and 78, where one of the panelists asked these questions that sound in the idea of toxic masculinity, that men have an entitlement to control women. That was the nature of direct questions put to John. All right. Thank you, Mr. Moore. I will hear you on rebuttal. Mr. Keller. Good morning. May it please the court. James Keller for the trustees of Princeton University. This case is not Princeton 3. Saying that out loud isn't running away from Princeton 3. It's reality. Princeton 3 without question confirms the contractual requirements under New Jersey law. When a private university implements disciplinary procedures, and it confirms the application of University of the sciences to a title 9 case. The district court didn't run away from that. The district court extensively cited this court's holding in Princeton 3. When looking at the breach of contract claim in the title 9 claim. But under appellant's view, Princeton 3 effectively serves as a go straight to discovery card. So long as you mimic the language of this court's opinion in Princeton 3. This case is different, clearly, in important ways. But let's dig into the facts a little bit. How did Jane learn that she was choked by John? Well, your honor, she talked to Sarah. And that's one way that she went. How did Jane first learn that she was choked? Jane first learned that she was choked when she talked to people the day after the incident. So student six is one of the witnesses who testified at the hearing and said that she talked to Jane and Sarah the day after the incident. And student six told Jane that Jane had been choked? No, student six heard that Jane had been choked. Heard from whom? From Sarah. Okay. So Sarah saw Jane get choked. Sarah did not see Jane get choked. No, your honor. Then how did — if Sarah didn't see Jane get choked, how could Sarah tell student six that Jane had been choked? That was Jane's — so Jane was saying to multiple people. Multiple people heard Jane say, he choked me or Z choked me. And in reflecting on that, the information that student four — so student four — So Z was the friend from home that had allegedly raped and choked Jane, correct? That's correct, your honor. Okay. It just seems to be quite confusing, right? And alcohol plays a role, right? People are falling down. I agree with that, your honor. Okay. I'm just not clear as to when Jane said for the first time she had been choked and knew she had been choked, if she hadn't given a contemporaneous report of that happening. And, your honor, I'm — obviously I'm constrained by the pleading here. That's not in — that is not made clear in the complaint. I have other information, but it's beyond the pleading that I — One of the ways these cases are different, as Princeton III in this case, is that there we were looking at more of a preponderance sort of standard. Here it's got to be clear and persuasive. It's an even higher bar. Given the pleadings here, inconsistencies in testimony, changing testimony, evidence of differential treatment, why isn't it even more clear here that the complaint does state both the contractual breaches and a Title IX claim? Thank you, your honor. The underlying facts of the two cases are materially different. So Princeton III involved a male complainant who made a complaint against a female respondent and a female complainant who made a complaint against a male respondent. And in Princeton III, John Doe alleged that at every step, Jane Roe was treated more favorably than he was. The underlying facts in that regard are apples and oranges. So Princeton III involved allegations that Princeton hadn't properly filed its Title IX policy. This is not a Title IX case. Princeton III involved the then permissible single investigator model, where there was no hearing and no opportunity for cross-examination. And Princeton involved an asymmetry of similarly situated people. Right. You've got that here. That's clearly different in your favor. But what about Judge Krause's question about the standard of review being less favorable to you? And talk to us, if you would, about that less favorable standard of review with the facts that seem to be all over the map here. You do have a situation where John is really grilled by the panelists, and every inconsistency, and there are many inconsistencies from Jane and Sarah, are just glossed over. Yes, Your Honor. So I do think, and not just the fact that the facts of Princeton III in this case are materially different, but I do think that is dispositive of that issue. So in Princeton III, this court held that the facts as alleged, which are very different facts, met the plausibility standard of Iqbal. The court in this case, admittedly under a different and arguably higher standard of clear and persuasive, And to touch on something else, Your Honor, that you mentioned, the decision here and that appellant mentioned, the decision here was not just based on the consistency of the witnesses. That's what the panel's opinion actually stated, and this is in paragraph 196 of appellant's complaint at the record at page 88. The decision stated that in boilerplate fashion, so that characterization is added, that the COD had considered all of the information obtained in the investigation, but, and then highlighted the point about consistent statements. So it wasn't just those statements that the court relied upon, that the panel relied upon. It relied upon all of the information in front of it, including text messages from John, that appellant also distinguishes and says, well, John was cut off when he tried to explain the context, what he considered to be blackmail about the recording with his parents, and the favorable witness to John was cut off when he tried to explain that he was misquoted by the investigator. That is his allegation in the complaint, Your Honor. We have to accept that as true. I agree, Your Honor, but the evidence that was... If one side is getting cut off and the other side is getting more than a fulsome hearing, isn't that sort of ipso facto evidence of a rigged game? I don't believe so, Your Honor, because, for two reasons. One, the panel did have before it, the piece that John contended was blackmail in particular, was the recording, not the text messages. So in the text messages, John says something like, I didn't think I hurt you, which is very different than I didn't do something to you, right? Well, he also said he didn't remember exactly what happened. That is true, but John also says that I've acted wrong in many ways, and the panel, in this case, considering all of that evidence, determined that Jane and Sarah's stories were more credible. How could they do that when Jane didn't even appear as a witness? What is the counter in their making that credibility determination? So, Your Honor, based on the complaint, which, again, we're bound by, so the committee clearly did not find John credible, and they found Jane's written interview statements to be credible interview summaries. And in your view, that meets a clear and persuasive evidence standard when one of the witnesses isn't even testifying at the hearing? Your Honor, I do believe that, and it goes back to an underlying issue with this, with appellant's theory, which is if we adopt appellant's theory, the discretion given to disciplinary panels at private universities will be stripped away. The disciplinary panel has to have the ability to assess credibility of the witnesses in front of it and the evidence in front of it. Right, but its credibility determinations have to have some basis in reality. They can't be the opposite of the evidence, right? I agree with that, Your Honor. And we can't have people falling asleep. I agree with that, Your Honor. And it's probably also not a good idea to finish a hearing late at night and then in the next morning tell someone you're guilty. Where's the deliberation? I guess it's possible they were, after one of the panelists woke up from the nap, that they could have been deliberating into the wee hours. But the whole thing just sort of looks like a bit of a kangaroo court, doesn't it? I respectfully don't agree it was a kangaroo court, Your Honor. I'm aware of the screenshot that's in the complaint where it appears that a panelist fell asleep. I'm aware that's the allegation. What's not pled is what was being discussed at that moment and how it impacts John's claims. And the district court looked at, in its opinion, all of the evidence before the committee and determined— I might address the issues in two ways. So first, from a Title IX perspective, the district court determined that the information before the committee supported the committee's decision and that there was no evidence that plausibly suggested the committee's decision was impacted by gender or sex bias. And what you hear from the appellant and in their briefing is that, well, maybe there's not direct evidence, but there's this bundle of sticks, and the bundle of sticks taken together suggests sex bias. And what the district court did wrong, according to appellant, is looked at each one of those sticks independently. But if each one of those sticks independently doesn't support a Title IX claim, then all the sticks together don't support a Title IX claim. But didn't we already cross that bridge in Princeton III? We essentially said if you have the external pressure, like the Dear Colleague letter, the practices of Princeton, here are the protests and op-eds internally as well, you have that pressure and something more, some procedural irregularity. That's enough to draw this inference. And again, they're with a lower standard. So we have that here with the allegations and the complaint about the Dear Colleague letter, about that external and internal pressure. And as Judge Hardiman laid out, a number of procedural irregularities that raise concern about fair and impartial treatment. Why isn't that enough at the motion to dismiss stage to overcome that challenge? Your Honor, the pressure, which the district court noted, the pressure that appellant relies upon first ties to a Dear Colleague letter that's 15 years old now, and that has to do with Title IX cases involving sexual assault and sexual misconduct, which this case is not. Appellant also discusses more recent pressure on campus, people protesting how Princeton handles cases of sexual assault or sexual misconduct or allowing toxic masculinity. That's not this case. This is a personal safety case involving an individual who allegedly put his hands on the neck of two people on two different occasions within the same month. So I don't think the external pressure piece applies here, and I think the district court got that right. In terms of the irregularities, I do believe, Your Honor, the plausibility standard of Iqbal has to mean something. And if it is enough, and maybe this is what Princeton 3 stands for, but I don't believe that's the case, that if it is enough to use magic words and say, I think this process was unfair because I can't understand how the committee reached these credibility determinations, and that plus allegations about the Dear Colleague letter from 2011 is enough to get past the motion to dismiss, then I just think any disciplinary proceeding at any college or university is going to end up before a district court because someone will use the magic words, they'll tie it to the Dear Colleague letter, and that gets them past the motion to dismiss. Okay, so following up on your magic words point and building back on one of your prior discussions with my colleague about discretion and credibility determinations, what would be your articulation of what the limits are, if any, on the university's discretion in credibility determinations? Because my colleague pointed out if they're just absurd or defy reality, but is that the only time that discretion cannot be granted or any other limits? I believe it ties to the standards this court set for breach of contract cases. As long as the credibility determinations are tied to your procedures, which there's no violation of a procedure here making the credibility determinations, and are based on a fair interpretation of the evidence, and I realize that's the crux of the dispute here, but I think that is sufficient. So define fair for us. A little bit more meat to that standard, please. Sure, Your Honor. There is evidence in the record, and I understand that some might credit John's in-person testimony over Jane's written interview summary, but there is evidence in the record to support the decision of the committee, which is not made up of trained jurists or lawyers. These are people in the Princeton community who deal with a lot of these matters throughout the course of the year, and that there is something before them that supports their decision. Anything? So a mere scintilla of support? Not a mere scintilla of support, Your Honor, but if Jane said, John never choked me, and John said I never choked her, I'd agree. And the panel decided, yes, he did, that would be a problem. But I think Jane's statement... What if Jane was drunk and passed out and didn't say anything, and she said a day later it happened, and John said, I don't remember that happening, and the only percipient witness said he didn't see John choke her? Well, Your Honor, and this harkens back to your first question to me, student four in his statement to the investigator did suggest that John choked Jane, and then at the hearing sought to change that testimony, and the committee found that... Sought to explain why he was misquoted and was cut off, right? That is the allegation, Your Honor. Your colleague made the point that this could have been charged and processed as a Title IX violation, but that would have placed a higher bar before the university than the personal safety policy path that it chose. Is that relevant to our considerations? I don't believe so, Your Honor. I agree with something Your Honor said earlier that the vast majority of the cases that appellant cites are Title IX sexual assault, sexual misconduct cases, and I think they are distinguishable on that basis, but Princeton under its Rights, Rules, and Responsibilities document has discretion to charge student conduct violations so long as it meets the definition under the code as it deems fit, and this case, I'm not sure this case actually does meet the intimate partner violence definition, but I don't think that impacts this court's analysis, no, Your Honor. All right. Thank you, Mr. Keller. Thank you, Your Honor. Rebuttal. I'd like to start with my colleague's statement that Princeton 3 is wrestling with it as a go-straight-to-discovery card, and that if you use magic words, that's all you need to do. That's obviously not true. You can't just say they disregarded exculpatory evidence and get past the motion to dismiss. You have to be able to plead it with particularity, and that is what, again, we do with great detail in the complaint as to the exculpatory evidence, as to the unsupported credibility findings. So that concern, as in Princeton 3, there was no magic words concern there. The plaintiff pleaded with particularity that despite what Princeton said about having applied the preponderance of the evidence and how the panel claimed to be making credibility findings there, the plaintiff there still adequately pled that that is not, in fact, what the panel had done. Go ahead. Your colleague pointed out that the panel does say it considered all the evidence. The rights, rules, and responsibilities doesn't say that the committee needs to set out the particular weight that it's giving to evidence or explain itself in particular detail. So why should we infer from silence the biases that you would place on that decision? Yes, and that actually is what I wanted to address next, too. So if all a panel has to do is say we rely on all of the evidence, that would be a blanket card to discriminate or to hand down irrational decisions. The second thing I think, Your Honor, is that it's telling that the two pieces they did cite are completely unsupported. I think it's at least reasonable to infer that they picked the two pieces they did because they're the strongest pieces of evidence in their view, and there's just nothing there. But more than that— They might have been in a stronger position if they said nothing. And they don't have an obligation to write opinions and such, right? I would disagree with that, Your Honor. I think there are two bases or maybe even three bases here on which they do that. The first is that the First Circuit at least has held that the preponderance of the evidence standard requires an explanation of how you weighed competing evidence. It may not require that in every single piece of evidence. Of course it doesn't. But it at least requires it as to the most important pieces of evidence in a case. So that's the Stonehill decision that we cite in our briefing. That's at page 327 of that decision. And Oberlin College as well, in the Title IX context, said that the, quote, the failure of the hearing panel even to comment on the flat contradiction by the complainant was a, quote, procedural irregularity that provided strong support for those claiming bias. So I do think there is a legal requirement to actually explain these and that the failure to do so at least makes it plausible to infer that perhaps you weren't actually applying the evidence standard you were supposed to. But then here in particular I think there is actually a contractual provision for that as well because the appeal says if you're going to be, rather the RRR says if you're going to be sanctioned, there's a requirement that the panel explain adequately its decision so that you can understand why the sanction is being handed down. So that I think does then give an actual contractual hook for more explanation than is given here. To go to one of the specific pieces that my colleague cited that the panel may have relied on was the text where John says, I acted wrong in many ways. And that perhaps this is what the panel relied on. So I guess first of all you have to draw an inference that they in fact relied on this, right, which is not proper at the motion to dismiss stage. But if you look at the actual paragraph in the complaint where that comes from, paragraph 109, what comes immediately after that is that John said he acted wrong in many ways, quote, but again refused to concede he had choked her in any way. So that is not even close to any kind of admission that he had done what they said he did and what he was being accused of. My colleague also said that, you know, we didn't plead what was being discussed when Professor Harmon fell asleep. We actually do. It's in paragraph 13. Jane Rowe was, I'm sorry, not Jane Rowe, Sarah Smith was being, her testimony was being put on. So she fell asleep during arguably the most important testimony in the case, perhaps outside of John Doe's. Mr. Keller also pointed out that the Dear Colleague letter, it's more than a decade old. It was rescinded in 2017. How long can you, can plaintiffs point to that to say, well, there's this continuing inference? Is it decades later? So I think what we do in our complaint, Your Honor, is tie the continuing pressure from that regime and the sort of the things that it was fostering through the years up to just a few months before John Doe's proceeding. So we have articulated how, you know, the Pixar protests in 2019 and 2020 brought pressure to bear on the university. How before that, when the president, the education department was enacting the new regulations, there was pressure to stick as closely as possible to the old regime and to limit the application of the new rules. I think the fact that this was sent through the public safety process and not the Title IX process may even be an instance of that. But we have pled how all the way through May of 20, in just May of 2023, which was just a few months before the complaint was filed, Pixar protests and the things that they asked for were still being discussed in the Daily Princetonian. So, yes, again. So in other words, the Dear Colleague letter isn't what's important. What's important here is the reaction after the rescinding of the Dear Colleague letter. Correct, Your Honor. Because some schools might have been happy the Dear Colleague letter was rescinded, but your allegation, as I understand it, is that Princeton was very unhappy it was rescinded and there was turmoil on campus because of the rescinding. That's correct, Your Honor. And so in any case, Your Honor, a plaintiff would have to plead with particularity that this kind of external pressure existed, I think, closer in time. Now, how close in time does that have to be? I think some courts have said pressure that's a couple years remote is still relevant to consider. But the court today doesn't have to decide any of that because the pressure continued right up until the proceeding in this case. Counselor, I'd like to ask a question about the falling asleep, because you've referred to that a few times. Are you treating that as a poison pill, such that if someone falls asleep in a proceeding, then it's irremediably impacted and can't be recovered from? I mean, how is a university or we supposed to look systemically at a process and what impact there is of someone falling asleep? Yeah, I think that's probably, there could be a case where it perhaps is treated that way. That's not our allegation. Our allegation is that that is one aspect, among many others, showing that this panel was biased against John Doe. So that professor in particular... Wait, so falling asleep is bias? So because of the other allegations involving that professor, Your Honor, she, yes, I believe she cared so little about what Sarah had to say because it wasn't going to change her opinion of what was happening. Yeah, and I think the evidence of that is, as we talked about at the beginning of the complaint, someone who was on the inside said that Professor Harmon basically told everyone that it would be a moral failing to not expel John Doe and had effectively prejudged the case in this person's view. So your, the allegation there, the argument would be that if Doe had been a woman, the professor would not have fallen asleep. That's going back to the whole, is it about gender or respondent versus not respondent. So I hear you saying that maybe it's an anti-respondent issue, but like if the gender were different of your client, that the professor would not have fallen asleep. It's plausible to infer that, but I don't think you have to be able to say that gender is, would have been, like just a flip would have happened. That is certainly one way to show gender bias. But there are other ways, like you can just show that someone was simply motivated by someone's gender in acting a certain way. So yes, I think that is a fair inference to draw at this stage, even if other inferences are also possible, Your Honor. Thank you very much, Mr. Muha. Thank you, Mr. Keller. The court will take the matter under advisement. Also, the court would like a transcript of this oral argument to be equally split.